May it please the Court, I'm Xenia Gillick. I'm here representing Thomas Frank Maniscalco. Our Supreme Court once observed that extreme malfunction in the state criminal justice system justifies the granting of habeas relief. In the prosecution of Thomas Frank Maniscalco, there was malfunction in the state criminal justice system. Help me on something in this case. On the pre-indictment delay, the way the law is, that's not very strong here. But the nine-year delay between indictment and trial, that's pretty interesting. The excerpts of record and the blue brief were so long that, frankly, I do not have a master, and there was too much paper in the excerpts to get through the whole thing. So I need your help on some things. First of all, what was the reason for getting rid of the judge? Which one? The one that went on the writ? Judge Millard? Judge Millard. The reason was that when Mr. Maniscalco was a practicing attorney in Orange County, Judge Millard was also working, prior to being elevated to the bench, he was working as a deputy district attorney. And they came against each other in a case, I believe it was Thomas Pugh, I think it's kind of irrelevant who the defendant was. But they came, Mr. Maniscalco was representing someone, deputy district attorney, then Millard was the DA, and they had an instance which is not clear from the record exactly what happened, but it resulted in Judge Millard seeking contempt proceedings to be brought against Mr. Maniscalco. So it became personal, it wasn't just a matter of professional... I was thinking, if all it is, is I represent the defendant, somebody else prosecutes the defendant, he winds up on the bench and I wind up before him, that's not a reasonable... Oh, no, absolutely, that happens all the time. I mean, no, this was a situation where it became personal and Judge Millard went after Tom Maniscalco, the lawyer, for... Okay, so how much delay did that cause and why did it cause that much delay? Well, I think that you could safely say that it caused three years delay, but it certainly wasn't three years. The writ... I don't understand why it would cause three years delay. It seems like you get a bunch of motions decided and then Maniscalco manages to get rid of the judge and persuade the new one that he ought to decide them all over again, and it looks like maybe a few months rather than three years. Why did it take so long? Well, what the court is referencing right now is part of the delay, which if you don't even include that, I believe that we're still talking and I can look at the brief to get exactly... But I believe that the writ itself took, I want to say, 18 months before it went to the California Supreme Court and it was remanded to the appellate court to take the issue up. So then it was at that point that Judge Millard voluntarily recused himself. That's not an unusual delay. No, that's not, but that would be part of what I'm referring to as being three years. And ironically, that's not even the instance that caused the most delay in this case. That's what's so remarkable. What did? If I had to choose one, I would have to say that it was the fact that the district attorney failed to turn over discovery despite numerous, even discovery orders from Judge Millard. The fact that the district attorney did not turn over... They're always going to have some disputes. They don't want to give up their snitch because they're afraid he'll get intimidated or killed. That sort of thing? No, we're talking about braiding material. Okay, we're talking about the... And when I say braiding material, I'm talking specifically about this witness, November, whom was turned over in 1989 along with the toll records, which changed the date of the offense. Nine years after the fact, they changed the date of the offense. I didn't understand what you just said. What evidence was this? That was the toll records from the Rizzoni residence. Remember back, I mean, I still remember toll records. The phone call. Exactly. Phone calls. You're talking about the phone calls. Exactly. And so what it showed was that the phone calls... Because back in 1980, we still had to pay tolls every time we telephoned someone out of our area code. So the toll records were found along with this report that was taken from this person only identified as Witness November, who provided evidence of who the murderers were and did not include Mr. Maniscalco. That was Brady. This isn't trying to protect a snitch or an informant. This is somebody trying to provide exculpatory braiding material. This information, along with the toll records, was found in a box in the police department in a filing cabinet in 1989. And on top of that, inside that same box, was a defense discovery motion filed by Ms. Harreld in 1985. So, you know, when these things are happening... Wait a minute. There's a motion in the box that was filed in 1985, and there's evidence in the box that was put in the box in 1989. And when did the defense get it? No. The evidence was put in the box at some unknown time. Unknown time. Okay. And the prosecution was saying, well, we're sorry. We just found this evidence in a box, and it must have been sitting in the police station since 1980. How much delay did this lead to, this late production? Well, the late production probably led to a significant portion of the delay that happened between this first and second trial. Once it's produced, I can't see why it would be more than a month or two of delay. Well, see, there wasn't much of a delay based on that evidence being produced. And I want to stick with the delay. There's so many different moving parts in this case, but sticking with the delay, I use that as examples of the late discovery. There was other late discovery that came out. You know, the evidence that showed that Mr. Maniscalco, that the guns that were located in June of 1980 were turned over to him from the police department because on behalf of a client, the information with regard to Richard Steinhardt's deal with the prosecutor, those are other what I would call discovery violations which cause significant delay. I just don't get how it adds up to nine years. I mean, I could start. You know, I know. I'm sorry. Let me just interject right here. There was the first trial. Yes. Right? Right. Why doesn't that count for something? That is, the first trial occurred about six years after he was indicted. Right. Or the information was returned. Right? Mm-hmm. So then, and it's a fairly lengthy trial. Correct. And it's a hung jury. Right. Right? So why, how does that fit into the fact that he had a full-blown trial as a hung jury and nine months? How does that fit into the delay analysis? Well, you can take that portion out. I mean, obviously, that was nine months, but you don't count towards the ten years. But in any event, then you have three years in between. Right after that trial, then his, the counsel that he really liked, what's her name? Ms. Harreld. Ms. Harreld, who apparently did a terrific job in the first trial, gets sick or has a problem with her neck or something and is not able to proceed. And then the DA tries to disqualify her in some way. Correct? Correct. And Ms. Harreld was winning awards swing dancing at the time. And she had a neck problem during the first trial that took her out for, I don't think it was even that long, maybe a week or so. And then it was right before the, right as they finished the first trial and were getting ready, she had a relapse. So she missed, I think it was one court date. And after that, the district attorney brought this motion to recuse her. And he, in fact, then subpoenaed her doctor to come testify. The doctor testified. He said he sees no reason why she's going to have a recurrence of that. And in fact, she never did have a recurrence of that. But instead of accepting that and allowing her to continue, both her and Mr. Roth, his second chair, were relieved. And Mr. Maniscalco was left without counsel for six months while the court tried to locate someone who didn't have a conflict, which was another completely ironic thing that they ended up appointing someone who had a clear conflict, who, in fact, was responsible for executing or preparing the search warrant at Mr. Maniscalco's house. And then Mr. Maniscalco waived any conflict. He was just happy to have an attorney at that point. Well, Mr. Lifesey was a very well-known. Well, this was before Mr. Lifesey. This was Mr. Chatterton, was the first one who was appointed. And Mr. Maniscalco was told, if you waive a conflict with Mr. Chatterton, who prosecuted your wife and did the search warrant on your house, then we'll let Ms. Harreld back on. And so Mr. Maniscalco said, fine. He never once tried to fight any of these appointments. He was like, give me an attorney. So Mr. Chatterton is appointed, conditioned on him reaching a fee agreement with the Orange County Court. Well, we're talking, I think it's, and I may be wrong with all of the numbers, but nine months later, Mr. Chatterton comes in and goes, I haven't been able to reach a fee agreement. I'm no longer available. You're going to have to start all over. And they get Lifesey. So they, well, and they, again, dismiss Ms. Harreld, who was having no neck problems. So, I mean, these were the things that were going on. And then they appoint Mr. Lifesey. And then they have to appoint another attorney to. Once Mr. Lifesey comes in, though, obviously he's a brand-new lawyer to the case. Correct. A massive record. Agreed. A six-month trial, however long the trial was, eight months, with transcripts that had to be read. Agreed. So Mr. Lifesey was going to need a significant amount of time. I would agree, but perhaps they should have thought of that when they appointed him, and he had a potential conflict, which he wasn't able to resolve for a year. What about your client's, the argument that your client sponsored and acquiesced in a lot of this delay? That probably. He's a lawyer. Obviously knows what's going on. Doesn't really assert his speedy trial rights until late in the game. What about that argument? That, and I do want to reserve two minutes for rebuttal. We'll give you time. There's a lot here. Okay, thank you. That is one of the, there's so many things about the appellate court decision that are not based on the record, and that is one of the things that I find most troubling, is this notion that Mr. Maniscalco acquiesced to all of this. And the reason I find it troubling is that the first three and a half years of these proceedings, we have no record of who acquiesced to what. We have no idea. The lost transcript. The lost transcripts. The destroyed transcripts, which were destroyed, by the way, before the second trial in this capital murder case. So for the appellate court to glibly say, well, he. What do you mean destroyed transcripts? That implies somebody intentionally. No, no, no, no, I'm sorry. I didn't mean that. Part of the. Part of the. They're lost, or they're not maintained. I didn't mean that they were destroyed on purpose in order to harm the defendant. Right. But what they do in the course of things is every five years or whatever, they just. They purge transcripts. Just to make room. Okay. Right. Which is different than being lost. It's not like they misplaced them. Right. I understand. And so to think that this was somehow Mr. Maniscalco acquiesced to that portion, there's no support. Well, what about the single fact that he did not assert his speedy trial rights? I mean, that we can glean from the record. That wasn't until very late in this process, was it, the first time where he actually said, I want to go to trial? Well, I don't think that that is very clear as far as when we look at the first three and a half years of whether he acquiesced. And I think that there's. Which at the very beginning? Well, the first three and a half years. I guess that is the beginning. Well, I mean, there was a lot going on. Yes. According to your little chart here. Yes. That you provided. It was very useful. But there's a lot of defense activity going on in those first three years. There is. But it isn't because Mr. Maniscalco is trying to delay. I mean, these are unanticipated offense. You know, you have the court reporter who has a breakdown. You have the judge who does not want to recuse himself. You have the complete failure with discovery. I mean, I keep coming back to that because I think that's critical. Because the prosecution keeps saying, oh, we wanted to move this along. But at every step of the way, they were violating discovery orders. And there was a contempt hearing where the judge found that there were discovery orders that were violated. Can you point to me any other place in the record that we have where your client asserted his right to a speedy trial, other than that single instance, which I'm characterizing as late in the game? I believe that there was a point that came after the, and I'll get the exact site, but there was a point that came after he had asserted his right and the judge found good cause over his objection. And when they came back, they wanted, right before the second trial, when there was the question about his competence, they came back and Mr. Lifesay indicated that it was very difficult for him to get his client to agree. So he did eventually get him to agree, but it was apparent that there was some reluctance on Mr. Maniscalco's part. And that would be in volume four. I can get you the... Wait a minute. Are you saying that that's when he asserted his right to speedy trial? He asserted his rights earlier, and then when they came back, things continued to get continued. What do you mean when they came back? When they came back to court after Judge O'Leary found good cause for the continuance over the defense objection. Then they came back to court, and then again there was questions about whether or not they'd be able to do the motion in time. And then there was the questions that were raised about Mr. Maniscalco's competence. And so then they continued again, and Judge O'Leary asked, well... And this is in my brief, and I can get you the exact quote. But Judge O'Leary said something to the effect of, well, you know, Mr. Maniscalco, you know, he doesn't really have a choice. Either we continue this or we go to trial without any rulings. And therefore the prosecution is going to be able to do whatever they want. I mean, that was the kind of thing that was being said to him. So even though maybe he didn't jump up and down and say, I want to go to trial now except for that one time, you know, it was clear all the way along the way that if he was going to get a fair trial, he would have to give these attorneys time to prepare. And the fact that the attorneys, you know, between the first and second trial were being moved around and juggled around, I mean... Go ahead. Finish up. It just seems it isn't fair to, or it isn't constitutional, I should say, to have a client have to choose between two rights. And one is a right to a competent defense in exchange for a speedy trial. And that was what was happening all along. So how does this fit into the Barker? So, you know, you're in federal court in a habeas court. Right. You're under AEDPA. Understood. Which is tough. I understand. You know? So the clearly established law that applies here is Barker and what is it? What's the other one? There's two. Post-indictment delay by the United States Supreme Court. I would say Brilliant v. Vermont is important, too, and that was a 2013 case. And even though it goes... Barker and Doggett. Doggett. Doggett, right. Doggett. So how does this fit into the, how does your argument here that, I mean, this isn't like a case where, where the government, you know, forced a delay in order to gain an advantage. I don't, I don't see that. Well... I mean, it looks like there's various parts. I think you could infer. It looks like there's various parts of the whole system that when they come together, they're not very efficient. So, for example, you know, the Ritford, so Judge Millard, rather than disqualifying himself right away as soon as he realized who Maniscalco was, Millard could have just said, no, I think I can be fair. I'm a judge, and there's no reason why I can't be fair in this case, and I'm not going to disqualify myself. So when he made that decision, that prompted a whole series of actions by the defense, which ended up in a petition for hearing to the California Supreme Court some 18 months later. And finally, when the court issued that preemptory writ, or remanded it, or transferred it back to the court of appeals and said, issue a preemptory writ, Millard got the hint on disqualifying himself. Right. And that... How does that, I mean, how does that fit into this? Well, I think that the general rule of Doggett is that, you know, there's a balancing, and there's the continuum of a prosecution that acts in bad faith and delays, and then there's an official negligence in actually bringing a case to trial. And there's something in between. And I would argue, and I think that, you know, all of these speedy trial issues, it's all a balancing, it's all a totality of the circumstances test. And if you have the more, you know, egregious maybe the State's action is, then the less you have to show what, you know, cause or prejudice. In this case, if you've got to, I would urge the court to find that there was intentional actions on the part of the prosecution that were intended to defeat the defense, not to delay necessarily. I would say that. And then we have to look at the last reasoned decision of the California courts, and that's the California Court of Appeal. And there's nothing in the California Court of Appeal opinion which says that. I agree. And you know what, Your Honors? The California Court of Appeal decision is not supported by the record, and I urge the court... Let me ask you about that. That struck me here as a real problem for your case because of the language of 2254D. They have to be... I can't remember the precise language, but basically the findings of fact have to be totally out in left field here for you to win as far as I can see unless nine years is enough no matter what the reason is. And then I look at their findings, and they say at virtually every turn the defendant agreed to innumerable continuances. A lengthy continuance was required to allow a new attorney to prepare for trial. The judges and the prosecutors were pushing to get the case to trial, and they say Maniscalco preserved the issue of the nine-month delay after the appointment of Livesey or Livesey, but that delay was justified. No court has ever ruled that Judge Millard should have recused himself. Pre-trial motions virtually all involve some tradeoff in time, and the defendant availed himself of every possible avenue of such relief. If he wanted to insist on a right to speedy trial, he should have dug in as the defendant did in Johnson and stopped waiving time. And then Judge O'Leary specifically found that the defense had adopted a strategy of delay with Maniscalco's consent, and we cannot fault that assessment. That's really damning stuff. And if you can't get over the 2254D hurdle for us not following what the Court of Appeals said as far as the facts go, I don't get how we get from here to where you want us to go. And this is probably the most important thing, and that is that the appellate court decision is not supported by the record. I'd just like to give you some examples, and then maybe we can look at them individually. But just to give you some examples, particularly as it relates to the, let's start with the Sixth Amendment speedy trial issue. That's all I asked you about. It's all in that post-indictment section of the opinion. Each of the claims have some issues. The appellate court says that Mr. Maniscalco, that this was a tactical decision to delay. And surmises it was because the defense for Maniscalco wanted to see what happened with the defense on Mr. Duffy, who was a one-time co-defendant who was severed. The record, and this is the supplemental portion of the record, is the DA tries to join the defendants. And it makes clear that all along, as soon as Mr. Duffy and Mr. Maniscalco were severed, the agreement with Mr. Duffy was that he would go after Mr. Maniscalco. So there was never even a possibility that Mr. Maniscalco would be able to know what happened to Mr. Duffy. Even if that is an unpersuasive reason, still, it's very often in the interest of the defense to delay, because witnesses get hard to find, and newspaper stories fade out of everybody's memory, and prosecutors turn over, and the new ones have trouble mastering all the material that the old ones had. There are always good benefits to the defense from delay, except in rare cases. And that would be true. But again, let's look at what the reasons for the delay were. Let's start in 1984 with the grand jury transcript, because that was the first thing that triggered the first writs. The grand jury is transcribed by a woman called Cheryl Hilton, and Ms. Hilton is having, unfortunately, a breakdown during the time that she's transcribing these grand juries. A nervous breakdown. A nervous breakdown. She attests to the fact that she did not properly transcribe the proceedings. Rather than, the district attorney, rather than going in and getting another grand jury, or having a preliminary hearing, which at that time you could elect one or the other, the prosecutor continues to say, these transcripts are not improper. We have a declaration in the record of Ms. Hilton saying, you know, how she said, I... Well, it's not so easy, necessarily, to get another indictment, because the witnesses who were scared the first time are going to be scared the second time. And that's the other fallacy. None of these witnesses ever claimed that they were scared of Mr. Maniscalco. The only witness in the record that showed that there was fear was witness November, and that was the one who had exculpatory evidence for Mr. Maniscalco, and inculpatory to the individuals who were walking free, who did not... There was so much evidence that they were involved, and they're walking free, and they were the witnesses who were scared. And, in fact, the Court may recall George Warren was shot after he provided exculpatory evidence for Mr. Maniscalco and inculpatory evidence for Mr. Robbins. I thought the DA did get a second indictment. Yeah, and they did get a second indictment, finally, and that was the other thing I was going to say. So, but they got that after months of litigation. Did he stop waving time? I mean, the court of appeals says he could have dug in and stopped waving time. Well, Your Honor, I think that the idea that you can stop waving time when you have a situation where your attorneys are telling you, we have a grand jury transcript that is gobbledygook, it doesn't make any sense, and we have a transcriber who's admitting that she was not properly recording the proceedings. I mean, at that point, you have to, you're given a choice of I either wave time or I dig in and I proceed without a grand jury. Well, that sounds great. It means that the prosecutor won't be able to hold his witnesses to what they said at the grand jury, and you may have an appellate argument. Well, at that point, you're hopefully not thinking along the lines of an appellate argument, you're thinking along the lines of beating the case. So, I mean, but that was the first, and that's unanticipated. Attorneys can't tactically prepare for something like that or cause something like that. Then you have the appointment of Judge Millard, and then you have the series. But then you have the court of appeals saying there was never any court holding that Judge Millard couldn't sit. Well, that's because the Supreme Court, as this Court frequently does as well, said we think that this issue needs to be resolved. We're going to send it back to the court of appeal. And then Millard disqualified himself. Yeah. I mean, the writing was on the wall. But the point is that, and that's only, you know, yes, that was one of the instances, but that's only one of the instances that caused this delay. But, again, that couldn't have been anticipated by the defense. Then you have the issues with regard to the discovery violations and this constant pursuit of trying to get discovery. Then you have the courts, when they're trying to resolve all of these complex motions, you're having them trail the hearings behind small claims appeals. And so the attorneys have to come back on a different day. So is Mr. Maniscalco going to say, okay, I don't – How does that cause delay? Because they kept having to come back. They never heard the motions. If your motion didn't get done on Tuesday and you have to come in Thursday, you can't account for much of nine years that way. Well, you know what, Your Honor, this case you can because it happened so many times repeatedly, repeatedly. And we don't know if Mr. Maniscalco waived time or said anything during those times because a lot of it was during the first three and a half years. I mean, that particular kind of problem, that's extremely burdensome on the lawyers, but it doesn't account for much delay of the proceedings. Well, I would argue that it does because you can see that over and over. They come and they just put it over. And they put it over – they wouldn't put it over in a week. Let me ask you a different question. I cannot remember exactly what the law, the constitutional law is on this point as opposed to rhetoric and dicta and law relating to federal speedy trial statute and that sort of thing. There's law that says speedy trial isn't just for the benefit of the defendant. It's for the benefit of the public to resolve the cases in a reasonable amount of time. The trial judge made a remark in this case along the lines of, well, he couldn't do anything about it. And I thought, gosh, all the judges I ever appeared in front of could do something about it. They tell me when the trial date was and that's when it was going to be no matter how much I'd made motions and stuff. Is that law applicable to this case? That it's for the benefit of the public and not just for the benefit of the defendant? Well, in a philosophical sense, I would agree with the Court. I think it would be a benefit to the public to move cases along. I'm here representing Mr. Maniscalco. I wasn't asking you about what would be good policy. I'm asking you whether there's holding of the Supreme Court that the California Court acted contrary to. Well, I think that they acted contrary to the Supreme Court law that says, and I would think that it would be from the Doggett case, that between neglect and, I'm sorry, between, I can't read my own writing, between the prosecution's bad faith delay and official negligence in bringing one to trial occupies a middle ground, while not compelling in every case, is not tolerable simply because an accused can't show how it prejudiced him. So what we're talking about is we're talking about a scale. We're talking about prosecutorial bad faith versus just some mere negligence. I can't see prejudice to Maniscalco here. All I can see is prejudice to the public, frankly.  But the first trial he ends up getting hung jury. Correct, which I think shows how close the case was. Well, in the second trial the jury was out for a long time. And they sent a note of impasse. The other factor in the Barker analysis is prejudice. And I think that every court, even the trial court, found prejudice. The death of his father, that was big. That didn't look like it was prejudicial at all. I mean, he has a couple other family members testifying to the identical alibi. He was with us. He couldn't have been there. And one of them is his father, but his father died long ago. Even if the case had gone to trial promptly, the father would have been dead. So it didn't matter, and what's more, it's hard to see how one more family member supporting an alibi would have persuaded the jury of the alibi, since it was cumulative with other family members' testimony for the alibi. Well, if you read the testimony, which is in the excerpts of record of Grace Maniscalco, the mother, and Ann Wallace, the sister, it becomes apparent why this delay was so harmful. Because neither of them could recall events. And what's the most amazing part about this case is that the district attorney amended the information to include the date of the homicide on a different day, nine years after the events, and six years after Mr. Maniscalco was arrested. They said, oh, you know what, we got the toll records, we found these records, and now we're saying it was on May 24th and 25th, which was Memorial Day weekend, which gave the alibi nine years after the events, six years after the arrest. That is what makes this a very unique case. Let me ask you, assume for a moment that we would agree with you that there was unreasonable delay here, and that there was an unreasonable application of Doggett and Barker, or that it was contrary to the court, and I'm talking about the Court of Appeal opinion. Does that mean you're automatically entitled to a writ issuing, or do you have to also show brecht, get over brecht? I think we get over brecht by just what's in the transcript. And I was going through the various things that aren't supported in the record. So you would, is it your understanding that even if you, you still have to show that the error was harmless? Or not harmless, under brecht? Yeah, we proposed that the standard would be different for a speedy trial claim, but I think we can argue under brecht that this, that we've met that standard. What's the standard you advocated? That was the, is it Chapman, the harmless beyond a reasonable doubt. What was the harm? We talked about the father. The father, George Warren, who would have been able to, he was shot and killed. He was the brother of Phil Warren. The father died when? In 1984, shortly after Mr. Maniscalco was arrested. So he could have gotten a really speedy trial, and the subsequent nine year delay wouldn't have mattered at all. The really important thing is that he was sick. He was sick and they knew he was dying. If the prosecutors had alleged the date of May 24th and 25th, as opposed to May 31st. You're saying the husband would have managed to stay alive somehow? No, but they could have done a conditional examination. They could have at least somehow preserved his, that alibi information. Grace Maniscalco and Ann Wallace would have been able to preserve that in their minds and not be asked nine years after the event to try and recall what happened back on Memorial Day weekend. What else you got besides alibi testimony would have been supplemented by the father? Correct. I asked you what else? Well, what else would have been that they worked together. There was an allegation that the copy machine at the law office where both Tom and John Maniscalco worked was used to produce these false documents that Robert Robbins sent to his sister in Michigan in order to procure the victim's bike. There were several events leading up to and following. I don't think I got my question. What I want to know is a big murder trial like this. Oh, I would expect it based on what I've seen, which is in a different place altogether, different customs and procedures and all. I would have expected it to go to trial between one and two years after indictment, just based on personal experience. And here I've got nine years before the second trial. And I'm trying to figure out what happened between, say, year two and year nine that made it much harder for the defendant to win. Changing the date. Changing the date of the homicide, I mean, is just so incredibly harmful. I mean, imagine nine years after an event, you're saying, oh, this is when it happened. And this happened right before the first trial. Okay.  If you get the opportunity to read the transcripts of Grace Maniscalco and Ann Wallace's testimony. Summarize it for me in a sentence. Grace Maniscalco couldn't remember a thing. She was vague. Ann Wallace was vague, and she was a little bit hostile because they kept saying, well, you can't really remember that. And then the other thing was Dan Hamilton, who was the brother-in-law of Tom Maniscalco. He was married to his sister, Ann Wallace, and they were previously, and then they were divorced and had kids together. Dan Hamilton testified that on that Memorial Day weekend, he recalled calling Ann Wallace and finding out that she had taken the kids to Maniscalco's. Okay, so you're saying two things so far were prejudicial. The father died before trial, and the alibi evidence became less persuasive because the memories would have naturally faded of the alibi witnesses. Not only that, but let me, before I leave the Dan Hamilton, Ann Wallace thing, the prosecutor was allowed to say to Dan Hamilton on the stand, well, you never said that you had called your ex-wife at Maniscalco's house Memorial Day weekend. You never said that before. You've testified at other proceedings. You've never said that. You're building up on the second point you already made. The alibi was weakened because of the death. I want to know if there's other kind of prejudice besides to the alibi. The late discovery of the witness November, who had apparently provided exculpatory evidence for Mr. Maniscalco, that was provided in 1989. By the time that they went to interview her, the defense went to interview her, she had had some kind of illness that made her, she didn't recognize her children. She was just incapable of providing anything coherent, I don't know. When did she become demented? That's not in the record, because actually they only allowed Mr. Roth to have that information. He wasn't allowed to put anything on the record. I thought the argument is she could have been an effective witness if it hadn't been for the nine year delay. She was demented by the time we went to trial after nine years, and I want to know when she became demented. And that's not part of the record, because again. I don't know if there's prejudice there or not, because she could have been demented. Well, we do know she was not demented when she was interviewed with the Orange County officials, the DA. What year was that? It's not in the record. Anything else? While you're thinking about that, let me ask you a question. I understand the focus that we need to make in terms of what the California Court of Appeals did here. But I found in reading the United States magistrate judge's findings and recommendation in this case, in reading his analysis, who apparently read all 75,000 pages of the transcript and looked at this thing from every possible angle, I found his opinion not only informative, but very helpful in trying to sort this case out. Where did Judge Olguin get it wrong? He, again, relied on almost the entire opinion, or report and recommendation, is the opinion of the appellate court. Well, that's what he has to look at. Same thing we have to do. But where, I mean, he goes considerably beyond what the California Court of Appeals did and looks at all of these issues. And he concludes that your client, in fact, was prejudiced by the delay, but nevertheless, that you have failed, your client has failed to meet that very high bar that's associated with a habeas petition. Where did he get it wrong? Because he also relied on the findings of the appellate court, where they said that this was tactical decisions on the part of Mr. Maniscalco. Which, again, each of these things that I have identified as what caused the delay, whether it be before the first trial or between the first and second trials, none of those could even in any way, shape, or form be anticipated by this defendant in order for him to apply a tactic to employ it. And in addition, the government, I mean, the prosecution had all of their witnesses, they had already testified, they were in witness protection program, they didn't need anything to preserve their witnesses. They had the one witness, Richard Steinhardt, who passed away, who even Judge O'Leary commented, well, that's going to hurt the defense, because he was such a shady character that to have this as a readback by one of the prosecution investigators, as opposed to have the live witness there, was going to hurt the defense. Judge O'Leary even commented on that. So the one witness that they lost, that the prosecution lost, was, in fact, to the detriment of the defendant. So to say that any of these events were a tactical decision, did he decide that he didn't want the court to come up with a fee agreement with the first appointed attorney, Mr. Chatterton? I mean, did he decide that he wanted to have the court reporter not be able to transfer? I mean, those are the things, you can't, no one has pointed to one, no, I'm sorry. Just wrap it up right now, because we let you go way over. I know, I know, and I really do appreciate it. There's just a lot to this case. Yeah, there is. I'll give you a minute or two for rebuttal. Gather your thoughts, and let's hear from the State. Thank you, Your Honor. May it please the Court, Ronald Jacob, Deputy Attorney General for the State of California for Respondent. I believe it's important to step back and look at the standard of review here, because we can spend all day going through the transcript, DeNovo, and saying, do we agree or disagree with the court of appeal? But this is a 2254D2 case we would submit. Was the State court's factual findings unreasonable in light of the record before it? Counsel, let me tell you what's on my mind here. When I look at this thing through the 2254 glasses, the way I'm supposed to do, it's hard for me to say that the defendant, appellant, can get past his barriers on the facts found by the court of appeal, and it's hard for me to line up the case and say it's contrary to Barker v. Wingo and Doggett. But when I think of this case going to the Supreme Court, a more than nine-year delay between indictment and trial, and a superior court judge who just says, well, nothing I can do about it, I can't make them go to trial, all I can imagine is them saying, no, this is idiotic. Of course he can make them go to trial, and he should have, and all the excuses in the world don't cover that long a delay. It's just hard for me to see getting this done without winding up with some modification of the standards the Supreme Court imposes. So why don't you try to justify this? Well, we're not dealing with nine years of delay because of all the intervening factors. As the court was mentioning, we have the first trial, and then, of course, after the first trial, there has to be a period for everybody to... Typically a period of weeks or months rather than years. Yes, because it changes the whole... Typically it goes back to trial in a month or two, or else, more commonly, it settles out with a plea bargain. Well, in a case this complicated, I'd imagine defense counsel would want to perhaps reassess their defense. Who cares what the defense counsel wants? Usually the judge is the one who schedules trial and gets tough on delays. I mean, I've seen a lawyer ask for a continuance on a perfectly good ground, and the superior court judge happened to be in the room that day said, continuance? What's a continuance? They get to control when the case goes. Well, but they don't want to get reversed on appeal usually, and the stakes were so high here that the court was... I don't think the first trial lasts nine months. Nine months? Is this common in California, six years to the first trial and then a nine-month trial? No, but this was not a common case either. Well, not that uncommon. It looks like a drug hit, basically. Well, it was a very complicated case. As the court of appeals said, it was a complex case. He had very, very solid attorneys at the get-go. Yes, Your Honor. I mean, he got his hung jury. They didn't miss a beat. But if I come back to my original point, we have the first trial and then the regrouping after the first trial, the writ on Judge Millard. We also have Maniscalco 1, the appeal that went up in terms of his objection to substitution of counsel. That also contributes to delay, because if he would have won, we don't know who his attorney is going to be. He made a motion to disqualify Millard. Millard said no. He filed an interlocutory appeal, and then the appellate court said no. And then Judge Millard recused himself. Have I got that right? Yes, Your Honor. How long did that take? I'm not able to answer how long that took, Your Honor. Okay. Go ahead. But then we also have the Maniscalco 1 appeal in terms of the removal of counsel over objection. And again, that leaves up in the air. Why did the DA want to get rid of his counsel? Because they wanted to move the case along, and there was so much delay because of counsel's health problems. About a week here and a month there. Well, but it was continuing. And as the court of appeal was saying, it was the court and the prosecutor who wanted to move this along. And it was starting to look like there was no end in sight with this. So they wanted to get an attorney to get on with this. You thought they'd get a lawyer who wouldn't file a bunch of motions? No. A lawyer that would bring this to trial, finally. Well, a judge brings it to trial, not a lawyer. Well, wouldn't they get a new lawyer involved? I mean, any court. I mean, even a judge that's aggressive in getting a case to trial would have to give the lawyer, a new lawyer, sometime. Sometime to get up to snuff. And especially a case like here, any competent lawyer should read the entire transcript of the first trial. We know how long it took the district court. Do you have a precedent we can hang our hat on where there's a nine? I don't mean just words we can hang our hat on, but a precedent where there's a nine-year delay between indictment and trial, and either the circuit court or the Supreme Court says that's okay? I don't believe I'm. I found one where about, I think, five years was as long as I found. But, Your Honor, what I'm saying is it's not nine years. If you extract the totally legitimate explained reasons for years of those delays. 3161H Speedy Trial Act case, where what you do is start with, what is it, 60 or 70 days, and then subtract all the excluded amounts. This is a constitutional speedy trial, so it's a different methodology. I don't know if you do extract. No, but I'm saying I don't think it's fair to start with the premise there was nine years of delay. How can you call the first trial delayed? The indictment and the date the jury is sworn in when he finally goes to trial and the one where he was convicted. Okay, for the second trial. And there are plenty of excuses, like he went to trial in six years and it was a hung jury, and a new lawyer getting up to speed and all that. But what I want to know is, even with all that, do you have a precedent we can hang our hats on where appellate courts or ideally the Supreme Court have said that's okay, even though it's nine years or thereabouts? No, I don't, Your Honor. Counsel, let me ask you another question on the same subject. And I'm back into Judge Alguin's opinion, page 43. He's analyzing the Barker v. Wingo factors, those four factors. And he says, quote, here the nine-year delay between Petitioner's 1984 indictment and the commencement of his 1993 retrial is presumptively prejudicial and sufficient to trigger inquiry into the other three factors, sites to Corona Verbera, where there was an eight-year delay. Do you agree with that, that it was presumptively prejudicial? You can concede that. We did on appeal, so I'm stuck with that. So you're stuck with that, and you're basically where you started this morning, which is that we need to analyze this from the standpoint of the fact that it's a habeas petition. Yes, and listening to counsel's argument, her argument was basically that the court of appeal was wrong. But they weren't unreasonable. So there's two parts. You know, there's unreasonable determination of the facts. That's a tough one, as Judge Klinefeld has pointed out. But if you go back, I mean, is the court of appeal's opinion contrary to or an unreasonable application of clearly established Supreme Court law? Oh, I think that's the easy part, because they did apply Barker v. Wingo. They didn't cite Barker or they didn't cite Doggett. And let me ask you this. Did they actually do the balancing analysis that's required in Barker and Doggett? Yes, they did, because basically that court of appeal case, I believe Dunn-Gonzalez, that they used, just lifts language from Barker v. Wingo. And then, of course, for the pre-indictment delay, they directly cited Lovasco. I'm not talking about pre-indictment. I'm talking only about post-indictment delay. Did they do Barker, Doggett balancing analysis? Yes, they did. It looked like they just relied primarily or solely on the fact that he basically didn't, he consented to most of the delay and he didn't assert his speedy trial rights until right at the very end. Well, because under Barker, that kind of ends the analysis, if he's not asserting his rights basically on waiver principles. But they did look at the other justifications for it. And there was some questioning before about when he asserted his rights, and that was basically in 1987 at the time of substitution of counsel, as Judge Christensen said, late in the game. So really, we should be looking at perhaps a delay from that point. That's when he dug his heels in and wanted his speedy trial. How come the State never argued that the delay should only be looked at from the time the first jury is dismissed as a hung jury? Well, it's why didn't that start the clock over, so to speak? I mean, loosely speaking. I know it's not speedy trial, but why doesn't that? I mean, it seems to be pretty significant. He had a full-blown trial. Well, the court of appeal implicitly started the clock there. And since we're defending the State court's decision, we have to accept that. Well, what's wrong with that? Because as I just argued, that he didn't assert his rights at that point. He wanted delay. Delay was favoring him. He wanted to wait for the outcome of Duffy's case. So at the end of the second trial, where was Duffy? What was the status of Duffy's case? I mean, at the end of the first trial, what was the status of Duffy's case? Let's see. Duffy's convictions were affirmed in April of 95. I don't – I can't tell the Court now the date of the convictions. After – do you know when Duffy went to trial? Not exactly. I would just be working back from the affirmance date of 95, April 95. Do you have any concerns at all about the notes that were received? I mean, this case, the second trial, was sort of startling to me as a trial judge, the amount of notes that came out of that jury that the judge had to deal with. Are you concerned at all about those last two notes that reflected that perhaps this jury was at an impasse? You know what I'm referring to? You know that there was a – the judge received a note where they indicated that – I don't remember the exact language of it, but it's detailed. Maybe I can put my fingers on it here. The claim of coercion. Right. That's the issue. But – I'm not prepared for getting into a jury misconduct. Well, it's raised by the defendant. Okay. It's one of the issues. Yeah. We are – this is the first note. We are unable to agree on a unanimous verdict. What advice could you give us to resolve our differences and reach a unanimous verdict? She consulted with counsel and they sent a response back to that and basically said, you know, if there's some area of the law that I can help you with, let me know. And then they came back and they said, no, we're not really asking for any guidance as it relates to the – to a legal instruction or a legal issue, which I thought showed some sophistication on a part of this jury. Instead, they said, we – you know, we're having a difficulty coming up – you know, essentially difficulty as it relates to this case because of our interpretation of the facts. She didn't respond to that note and she didn't advise counsel of that note. Now, the jury went on to deliberate for another – for a few more days. There were a lot more notes that came out. My question to you is, do you have any concerns? It's certainly an issue raised by the defendant as to that indication on the part of the jury that perhaps they were at an impasse, just like the first jury. And then when you look at it in combination with the fact that the conviction here is for second degree murder, which reflects maybe it was a compromise verdict. So putting that all together, that's one of the defendant's arguments. What do you say to that? I would say since that's outside the COA, I'm unprepared to argue that issue and would ask the opportunity for a supplemental briefing. Yes, if we thought it was – let me – I just have one last question for you. It's one along the lines that I asked on Menescalco's counsel. So assume for a moment – just assume, don't – I just want to have this question with you. Assume that we were to conclude that there was an unreasonable determination – unreasonable application of Doggett and Barker, the framework, or that it was a contrary to. Do you have to go on to a Brecht analysis? What happened to that? Yes, Your Honor, for habeas relief. If this was a direct appeal, I mean, the due process violation would be the end of the inquiry. But on habeas, Brecht has to be applied. Which is whether or not there was any harm. Yes, a substantial and injurious effect on the verdict, which this Court has said is even a more stringent standard than Chapman. Right. And she argued for a Chapman analysis. I believe so, Your Honor. Okay. Let's see if my colleagues have any other questions. No? Okay, thank you, counsel. Thank you. You get one minute, and that's – I gave you a lot of time. So, make your final – Your Honor, I'd like to point to the record ER-10-1776. And this is Judge Franks speaking in 1988 when he is addressing why Mr. Maniscalco should waive time. He says, Mr. Maniscalco probably has few alternatives other than to respond with a time requirement to the very situation or to the very condition that his situation has created, which is whatever time is necessary for reading, rulings, hearings, and so forth is going to take place. And whether he waives or does not really probably has no effect. And I know Judge O'Leary later on said something similar. All of these judges recognized that Mr. Maniscalco was in a position where he had to make a tradeoff. He had to either have his motions heard or he had to waive time. And, Your Honor, I also want to point out that at that time when Judge Franks made that determination, it was because he was trailing Mr. Maniscalco's case behind a civil case. And so, Judge Kleinfeld, when you say that these judges could have done something, they could have done something. They didn't have to have a civil case before a capital murder case. And I ask the court to look at all of the references that we provide in our briefs that show where the appellate court's reasoning is not only wrong, it is unreasonable. And, again, we go back to this Duffy issue. The record established the agreement with the prosecutor and Duffy's defense team was that Duffy would go after Maniscalco. The only reason he went before Maniscalco in Maniscalco's second trial was because of what was happening with the juggling of attorneys. And, finally, Ms. Harreld, who has come to these oral arguments, she was present at every hearing and she ended up doing the trial for free to get it moving. She did a notice and she said, I'm moving this along. So to say that Mr. Maniscalco is responsible for being trailed behind civil cases, being bombarded with discovery at the last minute, having to fight to get every piece of discovery, is just not supported in the appellate court's record. And I implore the court to look closely at the record. And I appreciate all the time that you provided for us. Roberts. Thank you, counsel. We appreciate your arguments and interesting case. And the matter is submitted at this time.
judges: Christensen, Kleinfeld, Paez